No. 81-36

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

EARLE AND HAZEL KNIGHT, et al.,

Plaintiffs and Appellants,

vs.

THE CITY OF BILLINGS, a
municipal corporation,

Defendant and Respondent.

Appeal from:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellants:

Pedersen, Herndon, Harper, Munro & Hartman, Billings,
Montana
Rodney Hartman argued, Billings, Montana

For Respondent:

Peterson Law Offices, Billings, Montana
K. D. Peterson argued, Billings, Montana

Submitted:  November 30, 1981

Decided:  February 25, 1982

Filed: FEB 25 1982

Thomas J. Kearney
_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal from a judgment by the District Court, Thirteenth Judicial District, Yellowstone County, finding no inverse condemnation by the City of Billings of residential properties owned by the plaintiffs.

Plaintiffs are individual homeowners who own residences on the west side of 24th Street West between Lewis and Broadwater Avenues in Billings. They purchased their properties in the years between 1954 and 1976.

Twenty-fourth Street West is a major arterial street in Billings. It provides substantial "desire-line" access from a large portion of the Billings environs to a substantial mall, high school, church, and commercial area, located south of these residences. A part of the commercial area extends along 24th Street West itself.

The residences are all located within the Lillis Subdivision which was created in 1954. Lillis Subdivision was not in the City of Billings at the time of its creation. The land in Lillis Subdivision is subject to private deed restrictions which allow only single family dwellings until the year 2000. The portion of 24th Street West involved in this case was annexed to the City in 1959. Before that, in 1953, Yellowstone County had restricted the speed limit on 24th Street West to 35 miles per hour, and had installed stop signs for traffic entering the street from the east and west at intersections. Until 1972, 24th Street West was a two lane roadway with on-street parking. The first traffic lights on the street were installed at the intersection of Grand Avenue in 1970. The second followed in 1971 and there are at least four traffic lights now in existence at intersections along 24th Street West.

-2-

In 1972, 24th Street West was widened to provide four lanes of traffic and the residences here involved lost their on-street parking rights or privileges.

Rimrock Mall, now Montana's largest shopping center, was opened in 1975 on 24th Street West, south of plaintiffs' properties. There are also along the street two large discount stores, a supermarket, a hardware store, a mini-mall, two convenience stores, and several office buildings. Another supermarket is presently under construction on 24th Street West near plaintiffs' properties. The arterial also provides access to an interstate highway from the city proper.

Traffic development, as shown by traffic counts on 24th Street West indicates: in April 1966, an average daily vehicular traffic flow of 6,330 vehicles; in August 1970, 9,684 vehicles; on July 15, 1975, a traffic count of 17,040; and in 1979, an average daily traffic count of 18,018. Projections for the year 2000 range from 23,350 to 36,850 average daily vehicles.

In 1976, the City of Billings held public meetings concerning a possible condemnation procedure on 24th Street West, and thereafter, widened the arterial by condemning real property exclusively on the east side. No real property was taken from the west side of 24th Street West, where the plaintiffs have their properties.

The District Court found that no changes on 24th Street West were undertaken by the City until conditions existed which indicated that an adjustment was necessary to handle the traffic already there.

Plaintiffs' properties are subject to a zoning ordinance which was adopted in 1972. The zoning ordinance followed

extensive public hearings and an election. The properties on which plaintiffs have their residences were zoned R-7200, which zoning classification still applies to plaintiffs' properties. An R-7200 classification permits single family dwellings, and also duplexes if the lots involved encompass more than 9,600 square feet. None of the lots owned by plaintiffs meet the area specification necessary for duplex properties. All of the plaintiffs' properties here involved are single family dwellings and have been during all of the time that the plaintiffs have occupied the same, through the events that are being recounted here.

In 1978, after the condemnation of the property from the east side of 24th Street West, the street was widened by the addition of a fifth lane situated in the middle of the other four lanes, to provide for left-hand turns from 24th Street West. Also in 1978, the City created a lighting maintenance district to provide lighting for the arterial. The lights used were of a higher intensity than normally found on a residential street. Several of the plaintiffs protested the proposal for the lighting district, but their protest was denied as insufficient when numbered against all of the properties that were included in the lighting maintenance district.

Also in 1978, the plaintiffs petitioned the City Council of Billings for a zoning change which would permit plaintiffs' properties to be reclassified residential professional. However, a protest from the remaining property owners in Lillis Subdivision, located on streets other than 24th Street West, triggered the application of section 76-2-305, MCA. Section 76-2-305 provides that a proposed zoning change that is protested shall not become effective except by a

-4-

favorable vote of three-fourths of all the members of the city council. In this case, the proposed zoning change was defeated because only six of the ten council members, not the required three-fourths, voted in favor of the change. In consequence, plaintiffs' properties remain zoned R-7200 for residential purposes only.

After the failure of their petition for a zoning change, the plaintiffs filed this action against the City of Billings charging inverse condemnation of their properties.

At trial, plaintiffs' witnesses characterized the changes that had occurred on 24th Street West. Formerly it was relatively quiet, and had but two traffic lanes. The front yards of the residences were suitable for family or social gatherings. Residents or their guests could park their cars on the street. There was no difficulty getting in and out of driveways. Sidewalks were safe from passing traffic. Noise and pollutant levels were low and not distracting or harmful. There was no undue refuse. Family pets were safe. There was no noticeable vibration from passing traffic and the area was quiet at night.

After the 1976-78 condemnation project on 24th Street West was completed, conditions changed. There is now no free access into driveways, but instead long waits in the fifth lane for passing traffic. Free access to and from the driveways is nearly impossible. There have been traffic accidents in front of the residential properties, and sometimes upon their properties. Children and pets are not safe in the front yards and pedestrian traffic along the sidewalks a few feet from passing vehicular traffic is dangerous. Average traffic flows at 22 miles per hour past their houses. Rocks and rubbish from passing traffic are thrown upon their lawns

and into their houses. The sidewalks are constantly filthy, especially in winter. The noise from the passing traffic is so loud that front doors must be closed for conversation to be heard inside. Traffic noise is loud and aggravating at night. The houses cannot be ventilated from the east side because of dust and exhaust fumes. The houses and contents are constantly subject to vibrations. One of the residents testified that she had to tape her windows to avoid the bright light from the high intensity sodium vapor lighting that was installed.

There appears to be general agreement that the houses are unsuitable for residential living. A local realtor testified that it was "inappropriate" that the properties be zoned single family residential. The former city engineer, though testifying for the City, stated that he would "not want to live in one of those houses." The City Planning Department representative testified that he does not consider it appropriate to have residential housing along that section of 24th Street West. The City Zoning Commission in fact recommended the zoning change which was denied by the City Council. The District Court said:

> "By reason of changed conditions on 24th Street
> West, said properties are no longer desirable
> for residential use and cannot be put to the
> highest and best use without a change in zoning
> restrictions and regulations."

The District Court, however, found that the conditions on 24th Street West were not caused by the City but by persons using business establishments situated on 24th Street West; that the widening project of 1978 merely accomodated the existing traffic in a "more efficient, more safe, less noisy manner and with less pollution potential;" that the deed restrictions were more restrictive than the R-7200 zoning;

-6-

that the plaintiffs' real properties were less valuable in their present situs than they would be in a different neighborhood, but that nevertheless the value of their real properties had not been sufficiently lessened to constitute a taking by the City of Billings; that the actions of the City of Billings were within the proper exercise of the City's police power.

Issues raised by the plaintiffs are that (1) the District Court erred in holding there was no inverse condemnation; (2) the District Court erred in holding that the City of Billings acted within its police power and that it was not liable for damages; (3) the District Court erred in failing to take judicial notice of its own files and decisions in two civil causes involving restrictions on nearby properties; and (4) the District Court erred in holding that the private deed restrictions precluded any claim for damages for inverse condemnation.

The City contends that the only issues on this appeal are whether the City caused the plaintiffs' real properties to be inversely condemned because of changes in the conditions of 24th Street West or by failure to grant a zone change or both.

We turn first to a consideration of whether under the facts of this case, an inverse condemnation of plaintiffs' properties occurred. The City vigorously contends, and the District Court agreed, that the actions of the City were in response to the burgeoning development of commercial and other enterprises along 24th Street West. The City further contends, and the District Court agreed, that the City, in responding to those burgeoning pressures, validly exercised its police power in widening the street, installing high intensity lights, and providing traffic signals to facilitate a greater

-7-

flow of traffic past plaintiffs' properties. In essence, the City is claiming, and the District Court agreed, that it did not create the business growth, it merely adapted to it.

It is probable that there are few, if any, cases of inverse condemnation in which the same argument could not be made. In that area of law where inverse condemnation has most notably expanded--where airports have been constructed in populated areas and the resultant low-flying landing and take-off of jets has disturbed residential properties-- it is certainly true that the airport authorities have merely adapted to changing transportation patterns from land traffic to air traffic in providing airports. Yet the cases recognize that inverse condemnation has occurred, and recovery is allowed on the principle that an "air easement" has been taken, Griggs v. County of Allegheny, Pennsylvania (1962), 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585; United States v. Causby (1946), 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; or upon the theory of nuisance, Thornburg v. Port of Portland (1962), 233 Or. 178, 376 P.2d 100. It is not, however, a complete defense to an inverse condemnation suit that the authority was exercising police power. There is no question that here the City of Billings was validly exercising its police power. That fact, however, standing alone, does not prevent an inverse condemnation suit.

In Mattoon v. City of Norman (Okla. 1980), 617 P.2d 1347, the plaintiff commenced a class action for inverse condemnation against the City because of the adoption of a flood plain ordinance which operated to take plaintiff's property without due process of law. The City claimed it was validly exercising its police power. The Oklahoma court said:

-8-

"The defendant claims that the Ordinance
is a valid exercise of its police power through
zoning and cannot constitute a governmental 'taking'
of property.  This is not the test in Oklahoma.
We have never held that a finding that the exercise
of police power is valid absolutely precludes
compensation for property taken or damaged by such
exercise.  In [Citing cases], we said:

"'It is a universal principle that wherever an
individual's right of ownership of property
is recognized in a free government, other rights
become worthless if the government possesses uncon-
trollable power over the property of the individual.
The constitutional guaranty of the right to own and
use property is unquestioned.  Thus the claim that
particular action is taken under the police power
cannot justify disregard of constitutional inhibitions.'"
617 P.2d at 1349.

Nor is it important that an actual physical taking of

the plaintiffs' properties has not occurred.  Montana has a

constitutional provision, Art. II, § 29, which states:

"Eminent Domain.  Private property shall not
be taken or damaged for public use without
just compensation to the full extent of the
loss having been first made to or paid into
court for the owner.  In the event of litigation,
just compensation shall include necessary
expenses of litigation to be awarded by the court
when the private property owner prevails."  (Emphasis
added.)

This court recognized inverse condemnation without

physical invasion of the property in Less v. City of Butte

(1903), 28 Mont. 27, 72 P. 140.  There the court recognized

the words "or damaged" in the then existing constitution and

said:

"It seems very clear to us that this
section was drafted in the broad language
stated for the express purpose of preventing
an unjust or arbitrary exercise of the power
of eminent domain.  It overturns the doctrine
that one owning city or town property must
continually live in dread of the changing whims
of successive boards of aldermen.  Constitutions
which provide that 'private property shall
not be taken for public use without just
compensation' are but declaratory of the common
law, and contemplate the physical taking of
property only.  Under constitutions which provide
that property shall not be 'taken or damaged' it

is universally held that 'it is not necessary that there be any physical invasion of the individual's property for public use to entitle him to compensation." 72 P. at 141.

The respected former chief judge of the Court of Appeals for the Tenth Circuit, the Hon. Alfred Murrah, proposed this test, though writing in a dissent, for inverse condemnation:

"As I reason, the constitutional test in each case is first, whether the asserted interest is one which the law will protect; if so, whether the interference is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires the burden imposed to be borne by the public and not by the individual alone." Batten v. United States (10th Cir. 1962), 306 F.2d 580, 587, cert.den., 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502.

Here the asserted interest of the property owners is one which the law will protect. Certainly the right to the peaceful possession of residential property is the basis of such cases as Causby and Griggs, supra. The interference with plaintiffs' properties has been direct; it is peculiar in the sense that the facts here are unique; and the interference is of sufficient constitutional magnitude since the proof in this case showed that there had been a 20 to 30 percent reduction in the value of the individual residential properties, and that the value of each "as is" is $10,000 to $15,000 less than their values if the area were zoned residential professional. Though no physical taking has occurred, the result of the City's actions has been to impose a servitude, a limitation upon the use and marketability of plaintiffs' properties as residential.

Not to be forgotten is the condemnation by the City of property from one side of the street, and not from the other side where the plaintiffs reside, in the 1976-78 widening

of 24th Street West.  The owners on the east side of the street were compensated either in eminent domain proceedings, or by agreement with the City.  The singling out of one group as against another to bear a burden weighed heavily in Branning v. United States (Ct. Cl. 1981), 654 F.2d 88.  In that case, trainees at a United States Marine Corps Air Station, in practicing for landings on carrier decks, were required to hold their jet airplanes with noses up and tails down, and with near maximum power and noise associated with low speed.  This exercise was conducted over the plaintiff's land.  The Air Corps could have performed this exercise elsewhere but selected air space over the plaintiff's land for it because alternative locations were deemed more objectionable.  The Court of Claims said:

> "Thus, plaintiff was consciously singled
> out or selected to bear a burden which defendant
> also consciously elected not to impose on others,
> even others otherwise similarly situated.  This
> is a classic statement of a taking situation."
> 654 F.2d at 90.

We therefore hold and conclude that under the unique facts of this case, the City of Billings, although exercising its police power validly, and validly refusing to amend its zoning ordinance on plaintiffs' petition, nonetheless thereby interfered with the private property interests of the plaintiff so as to constitute a "taking" by inverse condemnation. We caution that this holding is limited to the situation here, where a physical taking across the street occurred.

We turn now to consider whether the declaration of restrictions of Lillis Subdivision limiting the use of plaintiffs' lots to residential purposes until the year 2000 prevents recovery through inverse condemnation.

On analysis one must concede, it seems to us, that the presence of the private deed restrictions in Lillis Subdivison

is a non sequitur as a defense to inverse condemnation here. The restrictions contemplate the use of plaintiffs' residences for residential purposes. It is not the restrictions that are damaging plaintiffs' properties; it is the action of the City in making the improvements that is making their properties nearly unusable and unmarketable for residential purposes. Under section 76-2-305, MCA, the City Council validly refused to amend the zoning ordinance for plaintiffs' properties to reclassify to residential professional, which would have substantially mitigated the plaintiffs' losses. The valid refusal of a zoning amendment, which nailed down the servitude imposed on plaintiffs' properties, stands on no higher ground, insofar as inverse condemnation is concerned, than a valid exercise of police power. What remains, above all, after the City has acted, validly or invalidly, is that plaintiffs' properties, through the actions of the City, have become unsuitable for residential use, and the plaintiffs' right to use their properties as contemplated by the deed restrictions is limited to a degree of constitutional magnitude.

In this connection, plaintiffs asked during the trial that the District Court take judicial notice of two of its own files, wherein the same District Court had held that similar restrictions on nearby properties were void and unenforceable by reason of the changed conditions on and near 24th Street West. While the files were certainly relevant under the view taken by the District Court that the deed restrictions prevented plaintiffs' recovery in inverse condemnation, it is our view that the deed restrictions only contemplate a residential use which cannot now be obtained by the plaintiffs. It is therefore immaterial to our decision that the District Court did not take judicial notice of the offered civil files, because the presence of the deed

-12-

restrictions is not a bar to plaintiffs' action for inverse condemnation.

The finding of the District Court that the improvement of 24th Street West "accomodates the existing traffic in a more efficient, more safe, less noisy manner and with less pollution potential" is clearly erroneous. Rule 52(a), M.R.Civ.P. The plaintiffs here testified in detail as to the effect of the improvements and the conditions which severely limited the use of their properties for residential purposes. The testimony of the city engineer, on which the District Court apparently relied, was taken from national studies and national guides for improvements, not directly related to plaintiffs' properties. No attempt was made by the City to rebut the testimony of the property owners as to noise, traffic and pollution.

The District Court, in its findings, set forth the purchase prices paid by the plaintiffs for their residences as compared to their "as is" values after the 1976-78 improvements to 24th Street West. In each instance the price paid for the property is less than the "as is" value. Thus, the District Court apparently found no damages suffered by plaintiffs. In effect, the District Court gave the City the advantage of inflation, which has affected the value not only of property on 24th Street West, but of all real property in Billings. However, the measure of damages in an inverse condemnation case is the difference between the fair market value of the property before and after the condemnation. The relevant values in this case are the fair market value as residential property before the condemnation, and the fair market value by reason of the depreciation as residential property (see section 70-30-302, MCA), where the property not taken has been injuriously affected.

In case it is important after remand, the right to an inverse condemnation remedy does not pass to subsequent purchasers after the inverse condemnation. Williams v. City of Valdez (Alaska 1981), 624 P.2d 820.

We therefore remand this cause to the District Court with directions to enter an order therein that the residential properties of the plaintiffs have been inversely condemned by the City of Billings in making the improvements to 24th Street West in 1976-78, which order shall serve the office of a preliminary condemnation order as provided in section 70-30-206(2), MCA; and thereupon to take such further proceedings under the statutes relating to eminent domain as shall determine the damages, if any, sustained by the plaintiffs.

_____
John C. Sheehy
                Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
    Justices

-14-