No. 87-148

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

IVAN and GERALDINE ADAMS, et al.,

        Plaintiffs and Appellants,

-vs-

THE DEPARTMENT OF HIGHWAYS OF THE
STATE OF MONTANA, and MISSOULA COUNTY,

        Defendants and Respondents.

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Milodragovich, Dale & Dye; Lon Dale argued, Missoula,
Montana

    For Respondent:

        Steve Garrison argued, Dept of Highways, Helena,
Montana
Robert Deschamps, III, County Attorney; Joan Newman
argued, Deputy, Missoula, Montana

    For Amicus Curiae:

        Jim Nugent, City Attorney, League of Cities & Towns,
Missoula, Montana

Submitted: December 8, 1987

Decided: February 18, 1988

Filed: FEB 1 8 1988

_Ethl M. Harrison_

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

This is an appeal from the Fourth Judicial District, Missoula County. Summary judgment was granted defendants/respondents Missoula County (County) and the State of Montana (State) on an inverse condemnation claim brought by landowners who lived close to Reserve Street in Missoula, Montana. The landowners, Ivan and Geraldine Adams and a number of other property owners (Landowners), appeal.

We affirm.

The issues are as follows:

1. Did the District Court err in granting summary judgment to the County because the County could not be found liable as a matter of law in inverse condemnation for construction on a federal-aid secondary state highway?

2. Did the District Court err in granting summary judgment on the merits because Landowners suffered no compensable injury under Montana law?

3. Did the District Court err in granting summary judgment to the State as a matter of law on statute of limitations for inverse condemnation and laches?

This suit arose out of the construction of a bridge on Reserve Street in Missoula. The completion of the bridge allowed for a west-side thoroughfare between Highway 93 on the south of Missoula and Interstate 90 on the north. Landowners are a number of Missoula property owners who own property adjacent to Reserve Street. Prior to the opening of the bridge on June 19, 1979, Reserve Street was a rural neighborhood with occasional traffic. After the opening, there was immediate traffic increase, including heavy trucks, and an increase of noise, air pollution, and dust accumulation. Some of the Landowners claim respiratory

2

problems due to this increase along with adverse consequences of pollution, excessive noise, dust, and inability to conveniently ingress and egress. The gravamen of their claim is based on property devaluation.

Reserve Street was originally designated as a federal-aid secondary highway system and is a state highway. No part of the construction of the Reserve Street Bridge project occurred any closer than one-quarter of a mile away from any residence of the Landowners. The right-of-way was "granted and donated to the use of the public forever" prior to purchase by any of the landowners. No right-of-way had to be acquired by the State and therefore no eminent domain proceedings ever were instituted.

Due to increased traffic on Reserve Street, the Missoula County Commissioners, after two years of planning and public hearings, adopted new zoning regulations permitting single and multi-family residential, professional offices and commercial development upon application for, and receipt of, a permit for specific use.

This suit is based on inverse condemnation alleged to have been caused by the increased traffic. The complaint was filed January 26, 1984 with no claim that the zoning was a taking, regulatory or otherwise, nor does it attempt to invalidate the zoning of the area. The complaint was filed over four years and seven months after the bridge was opened.

A motion to dismiss was filed by the State. On February 2, 1986, the District Court denied the motion to dismiss stating it was undecided whether a statute of limitations barred the claim and it was unclear whether the case of Knight v. Billings (1982), 197 Mont. 165, 642 P.2d 141, with the most important discussion of inverse condemnation under Montana law, applied.

The State and County filed motions for summary judgment in June of 1986. The District Court granted the County's motion for summary judgment on October 28, 1986 on grounds that, despite having input in to the construction of highways in its area, the County did not have legal authority nor legal responsibility on final decisions as to where and how construction of federal-aid highways occurred. The State's motion for summary judgment was granted January 13, 1987 based on the statute of limitations and violation of the doctrine of laches along with a statement of noncompensability.

Landowners noticed a hearing and filed a motion for reconsideration on January 19, 1987. A hearing was held January 28, 1987 and despite objections of the State, Landowners presented a number of exhibits and called numerous witnesses. The County was never formally served for the hearing on this motion but did have individuals in attendance.

Despite the additional evidence, no modification action was taken by the District Court within 45 days and therefore the motion was deemed denied and Landowners filed this appeal.

The standard of review on summary judgment has been made clear by this Court.

> On review, we will uphold the summary judgment if there is no genuine issue of material fact and the evidence shows the moving party is entitled to judgment as a matter of law. Sevalstad v. Glaus (Mont. 1987), 737 P.2d 1147, 1148, 44 St.Rep. 930, 932. . .
>
> When the movant has met this initial burden, the party opposing the motion must supply evidence supporting the existence of a genuine issue of fact. Flemming v. Flemming Farms, Inc. (Mont.

4

1986), 717 P.2d 1103, 1106, 43 St.Rep. 776, 779. Rule 56(c), M.R.Civ.P.

Vogele v. Estate of Schock (Mont. 1987), ____ P.2d ____, 44 St.Rep. 1950, 1953.

We initially note that the County was granted summary judgment prior to the State, yet testimony was still allowed as to County activity at the January 28, 1987 hearing. The District Court ruling releasing the County was based on the fact that the County could not be held liable for inverse condemnation as a matter of law where the State has exclusive jurisdiction over the state's highways. Although the District Court did not certify this summary judgment as final under Rule 54(b), M.R.Civ.P., Missoula County was never given notice by the Landowners in subsequent proceedings. We note the Landowners produced no authority in opposition to the County's motion for summary judgment and there was never any claim that the area was improperly zoned.

The County cooperates with the State in highway projects but there is no legal authority or responsibility in regards to state highway projects that is vested in the County. The State has the ultimate authority and responsibility for any state highway pursuant to § 60-1-102, MCA. "State and federal-aid highways" are defined in § 60-1-103(12) through (16) and (24) as any public highway planned, laid out, constructed, reconstructed, improved, repaired, maintained or abandoned by the department of highways. These include federal-aid secondary system highways of which Reserve Street was made a part over thirty years ago.

We have held that where a city sufficiently proves that a road is part of the state highway system, the city cannot be held liable for claims of negligent design, defect, regulation, or maintenance. State ex rel. City of Helena v.

5

District Court (1975), 167 Mont. 157, 536 P.2d 1182. We believe this same doctrine applies to counties and was satisfied by the County in this case. Therefore, we find that the District Court did not err in granting the County's motion for summary judgment. The District Court appropriately stated:

> [T]he Court is satisfied, as a matter of law, the State of Montana, acting through its State Highway Commission, has the exclusive authority to determine the location of state highways such as are involved here. Therefore, the County of Missoula cannot, as a matter of law, be held liable for the consequences of the location and construction as ultimately approved by the State Highway Commission.

We also hold that the District Court did not err in granting the State's motion for summary judgment on the merits of this case due to the fact that the Landowners have at the most, suffered a noncompensable injury and Knight, supra, does not apply.

The Montana Constitution, Art. II, § 29 provides as follows:

> Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.

The Landowners rely upon this constitutional statement in bringing this action. The claim is not brought for nuisance, a tortious act which does not allow recovery of expenses of litigation. Additionally, the claim is not strictly by eminent domain because there was no actual "physical taking." The Landowners instead rely on the

6

doctrine of inverse condemnation. Inverse condemnation is "[a] cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." Thornburg v. Port of Portland (Or. 1962), 376 P.2d 100, 101, citing State by and through State Highway Comm. v. Stumbo et al. (Or. 1960), 352 P.2d 478, 480.

We have held that it is not a complete defense to an inverse condemnation action for the governmental defendant to claim that it was exercising its police power. Nor is it required that an actual physical "taking" occur. Knight, supra, 642 P.2d at 144. In Knight, we stated that inverse condemnation could occur without physical invasion of the property.

> Under constitutions which provide that property shall not be "taken or damaged" [as the Montana Constitution so provides] it is universally held that "it is not necessary that there be any physical invasion of the individual's property for public use to entitle him to compensation."

Knight, supra, 642 P.2d at 145, citing Less v. City of Butte (1903), 28 Mont. 27, 72 P. 140, 141.

The Knight decision relied heavily on a test developed by the former chief judge of the Court of Appeals for the Tenth Circuit, Hon. Alfred Murrah, who wrote in a dissent:

> As I reason, the constitutional test in each case is first, whether the asserted interest is one which the law will protect; if so, whether the interference is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires the burden imposed to

7

> be borne by the public and not by the
> individual alone. (Emphasis added.)

Batten v. United States (10th Cir. 1962), 306 F.2d 580, 587, cert. den., 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502.

In this case, we are faced with a determination of whether the interference caused by increased traffic, which occurs when a bridge is opened, is of direct, peculiar and sufficient magnitude to allow for compensation.

Generally, the testimony and exhibits offered by the Landowners at the subsequent hearing on the motion for reconsideration of the granting of summary judgment would not be allowed. Rule 52(b), M.R.Civ.P. outlines the procedure for amendment of the findings and it may be raised with a Rule 59 M.R.Civ.P. motion for new trial. However, any motion for a new trial "[s]hall state with particularity the grounds therefor . . . " No new trial, allowing additional evidence, is generally to be granted in cases tried without a jury except for the explicit grounds enunciated in § 25-11-102, MCA, subsection (1), irregularity in the proceedings or abuse of discretion, (3), accident or surprise, or (4), newly discovered evidence. Section 25-11-103, MCA.

The rules should be followed at all times by any practicing attorney. In this case, the Landowners' counsel failed to abide by the mandates and did not specifically set out grounds on which any hearing should have occurred. Considerable evidence was allowed subsequent to the District Court's order granting summary judgment. Nonetheless, we have stated that the rules encourage disposition of cases on their merits and therefore we will consider all evidence presented to the District Court. White v. Lobdell (Mont. 1984), 678 P.2d 637, 642, 41 St.Rep. 346; Rambur v. Diehl Lumber Co. (1964), 144 Mont. 84, 394 P.2d 745, 749.

8

Landowners strenuously argue the application of Knight in this case along with a citation from 2A Nichols on Eminent Domain § 6.31[2], pp. 6-221-6-222, which states:

> Personal inconvenience or discomfort to the owner or interference with the business conducted on the land is not compensable unless such results are causative factors in the depreciation in value of the land.

They claim that testimony of the "unique" character of Reserve Street was presented by the individual landowners and their expert, Barney Olson, an MAI appraiser and owner of Olson Appraising and Consulting, thereby raising a question of fact. It was through this testimony that the Landowners argue they have satisfied the test of Knight that the interference is sufficiently peculiar for compensation. We disagree.

The Knight opinion stated "[u]nder the unique facts of this case . . ." and "[w]e caution that this holding is limited to the situation here . . ." The case itself involved a claim for inverse condemnation by landowners not only for increased traffic and resulting inconvenience caused by the widening of 24th Street West in Billings, but also for limited zoning placed on the neighborhood by the City of Billings.

The area involved in Knight was zoned residential only. This was a significant factor because:

> [T]he interference with plaintiffs' properties has been direct; it is peculiar in the sense that the facts here are unique; and the interference is of sufficient constitutional magnitude since the proof in this case showed that there had been a 20 to 30 percent reduction in the value of the individual residential properties, and that the value of each "as is" is $10,000 to $15,000 less than

9

their values if the area were zoned residential professional. Though no physical taking has occurred, the result of the City's actions has been to impose a servitude, a limitation upon the use and marketability of plaintiffs' properties as residential.

Knight, supra, 642 P.2d at 145.

Additionally, there was a condemnation of property on the east side of 24th Street West and these landowners received compensation either in eminent domain proceedings or by agreement with the City of Billings. There has been no similar singling out of one group or individual in the case at bar.

Missoula County zoned the area in question in a manner which allows not only residential, but commercial and professional office use under a permit program. The District Court took judicial notice of the findings of the Missoula District Court in Cause No. 57548, an action for an injunction brought by many of the same claimants in this action, in which it was stated:

[T]he permit system contains specific standards which, when applied to multi-family residential and non-residential uses, reduce the impact of more intensive uses on adjacent residential uses.

[T]he purposes . . . foster a mixture of uses along Reserve Street, including commercial uses, while protecting the residential property values of land adjacent to the district, to minimize traffic congestion and reduce traffic hazards, and to promote development which can withstand the noise generated from Reserve Street.

Mike Kress, of the Missoula Office of Community Development, testified that although there were complaints

10

about understanding the zoning permit procedures, no application for a zoning change to "commerical" had been denied.

The Landowners rely on the conclusion of Olson in a report he submitted in regard to the Reserve Street Project that the Reserve Street corridor is unique. Olson noted that the traffic count along Reserve Street increased from 7,648 daily vehicles in 1978, prior to the date when the bridge was opened, to 13,940 in 1979 and 13,700 in 1980. This increase directly correlated with decreases over the four other major bridge crossing routes connecting Missoula's south and north sides during this same period of time.

Olson asserted the "hybrid" zoning allowing residential, commercial and business office use did not lend itself to any of these uses adequately. Therefore, he concluded, the properties did not increase in value with the normal expected market demand. The District Court, however, stated in its conclusions of law in granting the motion for summary judgment that "[t]he present plaintiffs' property may be used for not only office use, but also limited commercial." Although this conclusion was made prior to either Kress' or Olson's testimony, it clearly shows the District Court determined that the zoning was not only appropriate but sufficient to maintain value in the Landowners' properties.

Additionally, Olson's claim that the property was unique cannot be accepted by this Court. Any property that is adjacent to an improved roadway is going to suffer the adverse consequences of traffic increase. To allow recovery for the Landowners in this case would open a Pandora's Box which would, as the State, County and Amicus Curiae have argued, make development or improvement of highways and roadways in the State of Montana cost-prohibitive.

11

The District Court appropriately stated:

> The benefits which come and go from the changing currents of travel are not matters in respect to which any individual has any vested right against the judgment of the public authorities. State v. Peterson, 134 Mont. 52, 68, 328 P.2d 617 (1959); 4A Nichols on Eminent Domain, § 14.15[4], P. 14-340 (Rev. 3d Ed.). To say otherwise would allow any property owner or resident of land adjacent to a public roadway to file legal claims against the governmental agency responsible for the maintenace/construction of the roadway whenever vehicle traffic upon the roadway increased to a point where the resident/owner objected. This is not the status of the law in this area.

We sympathize with the plight of the Landowners. However, the wheels of progress shall not be slowed. There is no doubt that increased traffic volume, traffic fumes, noise, dust and difficulty of ingress and egress caused inconvenience or discomfort to the property owners when the Reserve Street Bridge was opened. Nonetheless, we find these detriments to be noncompensable. The benefit that these Landowners will receive is that more traffic generally is a bonus to commercial property. No substantial evidence was ever presented showing that this property was not valuable if used in a commercial fashion.

In 5 Nichols on Eminent Domain, § 16.101[2], p. 16-13, it is stated:

> Certain types of damage caused by the laying out of a highway have been rejected as compensable elements bearing upon the depreciation in value of the remainder area. Thus, where the injury complained of is not peculiar to the tract out of which the land taken was carved, but is, in fact, an injury common to all land in the neighborhood and to

12

the public in general it may not be considered. Increased traffic . . . ha[s] been rejected on this account. Diversion of traffic, too, and the resulting loss of business, have been denied consideration. The fact that an owner's property would have been enhanced in value to a greater extent by the location of the highway at a different point does not give rise to an element of damage meriting legal recognition.

Courts that have considered the claim advanced by the Landowners have rejected compensation on the grounds of damages caused by increased traffic.

Accordingly, the considerable increase in noise levels at Dreher Park caused by passing traffic on I-95 is no more than a "taking" than has been inflicted on countless tens of thousands of Florida residences (not to mention an abundance of parks and golf courses) whose occupants endure the consequences of endless traffic noise from adjacent arterial highways. . . The damage to Dreher Park is no different in kind from that suffered by anyone else similarly situated. . .

Division of Administration v. West Palm Garden Club (Fla.App. 1977), 352 So.2d 1177, 1181.

Yet if no part of an adjoining property owner's land is taken, that neighbor will receive no compensation for the loss he may have suffered by virtue of his property now being close to a noisy expressway.

Washington Market Ent., Inc. v. City of Trenton (N.J. 1975), 343 A.2d 408, 413.

In this case the effect of the construction is not limited to the neighborhood, or even to plaintiff and her three neighbors, and certainly not to the plaintiff alone. All the owners of

13

such property, like the plaintiff here, must suffer the noise of traffic and must view less pleasant surroundings. In the metropolitan areas through which Interstate 10 passes, literally hundreds of houses which once had ingress and egress by direct routing of streets are now situated below elevated multi-lane highways and are reached by circuitous or more inconvenient routes. These are not in themselves special damages; they have not been and are not recoverable. [Citations omitted.] Even when, as in the instant case, an actual diminution in market value of the property is found to exist because of these factors, this diminution is not compensable. Damages which cause discomfort, disturbance, inconvenience, and even sometimes financial loss as an ordinary and general consequence of public improvements are not compensable, and are considered damnum absque injuria.

Reymond v. State Department of Highways (La. 1970), 231 So.2d 375, 384.

[P]laintiff argues that the value of his property has been decreased by the flow of traffic on the newly constructed highway. It is clear, however, that not every conceivable kind of injury to the value of adjoining property resulting from highway construction is "damage" in the constitutional sense. [Citations omitted.] Thus, while a reduction in property values may result from the noise, light, vibration, or fumes produced by the proximity of increased vehicular traffic on a newly constructed highway, such consequential damage is not usually treated as "damage" in the constitutional sense. [Citations omitted.] Noise, light, vibration, and fumes from traffic on modern four-lane highways are "inconveniences that are reasonably incident to the prosecution of necessary public enterprises" and as such must be and are borne by the public at

14

large. [Citations omitted.] The cost of compensating all owners of property adjacent or proximate to newly constructed highways affected by these side effects would be so prohibitive that it would effectively halt the construction of highways by the State. [Citations omitted.]

Thomsen v. State (Minn. 1969), 170 N.W.2d 575, 579.

[T]he court found that the remaining land of the defendants was further depreciated in the sum of $3,896 for greater traffic noises due to the fact that the travel portion of the improved highway is now closer to the residence of the defendants than was formerly the case. The court disallowed this item of damage upon the grounds and for the reason that such damage is not special, unique and peculiar to the property of the defendants.

State Road Commission v. Williams (Utah 1969), 452 P.2d 881, 882.

[D]efendants argue that their right to be free from the increase of noise, fumes and annoyances which the presence of the freeway will entail is a part of their abutting land owners' right of light, air and view . . . In City of Berkeley v. Von Adelung, supra (1963) 214 Cal. App. 2d 791, 29 Cal.Rptr. 802, the city in rounding off the angle of a street corner took a portion of defendant's corner lot. "Defendant offered to prove that the effect of the project as a whole would be to approximate triple traffic past defendant's lot, with resultant increase in fumes and traffic noises." [Citation omitted.] The court held that any decrease in the value of defendant's remainder because of this was uncompensable: that it was an inconvenience "general to all property owners in the neighborhood and not special to defendant."

People v. Presley (1966), 239 Cal.App.2d 309, 48 Cal.Rptr. 672, 677.

> Assuming, without deciding that there was damage, it was incidental to the construction of the freeway. A constitutional provision such as Article II, § 17 [virtually identical to Montana's Art. II, § 29], does not contemplate damage incidental to the building of a highway where there is no physical invasion of a plaintiff's property . . . Any other interpretation would require the State to anticipate any and all damages that might indirectly occur to property and the payment of money in court before a highway could be constructed.

Rutledge v. State (Ariz. 1966), 412 P.2d 467, 471.

> It is established that when a public improvement is made on property adjoining that of one who claims to be damaged by such general factors as change of neighborhood, noise, dust, change of view, diminished access and other factors similar to the damages claimed in the instant case, there can be no recovery where there has been no actual taking or severance of the claimant's property . . . To thus enlarge the scope of the state's liability under article I, section 14, would impose a severe burden on the public treasury and, in effect, place "an embargo upon the creation of new and desirable roads."

People v. Symons (Cal. 1960), 357 P.2d 451, 454, 455.

Historically, Montana claimants have been faced with the problems of increased traffic on public thoroughfares. In Kipp v. Davis-Daley Copper Co. (1910), 41 Mont. 509, 110 P. 237, citizens of Butte attempted to obtain an injunction to restrain the railroad company from building and operating a railway through the city of Butte. The District Court granted the injunction and this Court reversed. In that

16

opinion, the policy in regard to development of public transportation was adequately supported:

> For a highway is created for the use of the public, not only in view of its necessities and requirements as they exist, but also in view of the constantly changing modes and conditions of travel and transportation, brought about by improved methods and required by the increase of population and the expansion in the volume of traffic due to the ever-increasing needs of society. Were this not so, any change in these respects would require a readjustment of rights as between the public and the abutting property owner, because the result of it would of necessity be held an imposition of a new burden upon the highway, and hence upon the property of the abutting owner. For these changing public uses the owner must be presumed to have received compensation when the highway was created.

Kipp, supra, 110 P. at 240.

The Landowners have not shown that their situation is any different from the quandary facing the citizens of Butte over 75 years ago. They have received benefit from the mere fact that although their property may have decreased in value as residential property, it has undoubtedly increased as commerical property.

The respondents appropriately point to Bolinger v. City of Bozeman (1972), 158 Mont. 507, 493 P.2d 1062, 1066, in which the Court stated:

> Indeed, many of what are now urban highways were merely country roads when the public acquired its easement in them, and doubtless many highways that are now merely country roads will in time become urban streets. When such changes occur, will the abutting owners be entitled to new compensation . . . Where land is conveyed for a public highway the

17

> implication must be that it will be used
> as the convenience and welfare of the
> public may demand, although that demand
> may be augmented by the increase of
> population. The benefits which an owner
> of the servient estate receives from the
> increase in population and consequent
> building up of the community usually far
> more than compensate him for the
> increased burden he may claim to have
> suffered.
>
> Where land is dedicated or appropriated
> for a suburban road, the implication must
> be that it shall be used as the
> convenience and welfare of the public may
> demand, although that demand may be
> augmented by the increase in population,
> or by a town or city springing up in the
> territory traversed by the road.
> (Emphasis in original.)

The Landowners have not shown that their situation is any different from any other property owner who suffers the affects of living adjacent to a roadway with increased traffic.

We find it unnecessary to determine which statute of limitation applies to inverse condemnation cases as this opinion sets out the noncompensability of the Landowners' claim. Both the Landowners, who claim that a constitutional right violation has no statute of limitations, and the State, which argues the Landowners are limited to the two-year statute of limitation for damage, waste or trespass to real property pursuant to § 27-2-207, MCA, present interesting and feasible arguments. We find that the District Court did not err in granting summary judgment.

We affirm.

_D. C. [signature]_

Justice

18

We concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_[signature]_

_R. E. McDonough_

_William E. Hunt_

Justices

Mr. Justice John C. Sheehy, dissenting:


This appeal is really from the orders of the District Court dated October 28, 1986 and January 13, 1987, granting respectively summary judgments to the county and the state.

At least it may be said for the order of October 28, 1986 in favor of the county that is a decision based upon law as the District Court perceived it. However, the summary judgment in favor of the county was improper, because genuine issues of material fact exist as to whether the county, by its lack of enforcement of its truck routes, and its zoning policies, has jointly damaged the property owners here.

The summary judgment in favor of the state is peculiar. It is founded on findings of fact and conclusions of law by the District Court, adopted verbatim from a submission by counsel for the state. In its findings, the District Court resolved issues of fact in favor of the state, a most improper procedure when deciding a motion for summary judgment. By the very act of deciding factual issues, the District Court shows that there were genuine issues of material fact, which would preclude summary judgment without a trial. The District Court concluded its order of January 13, 1987, saying:

> From the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendants' June 30, 1986 Motion for Summary Judgment is properly made and submitted; is supported by the evidence submitted to the Court, and is hereby granted to these defendants and against the plaintiffs to this action.

I would reverse the summary judgments and remand for trial.

_____
Justice