JUSTICE NELSON,
dissenting.
¶60 I join Justice Leaphart’s dissent. I write separately to address three additional facets of this case.
I
¶61 First, the fallacy of the Court’s resolution of Issue One is apparent from its application of selected Hamilton City Ordinances to the exclusion of others. As Justice Leaphart ably demonstrates, §§ 17.116.010 and 17.116.050 are clearly intended to protect a specific class of persons — occupants in the vicinity of a proposed precise plan of design-from a particular type of harm-substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties. That the City intended to protect the Neighbors and their properties is evident not only from the plain language of these ordinances, but also from the fact that the zoning board mailed notices to all property owners and commercial tenants within 300 feet of the Kennedy property. On the facts presented here and the unambiguous language of §§ 17.116.010 and 17.116.050, the special relationship exception to the public duty doctrine clearly applies.
*228 ¶62 To avoid what is plain on the face of §§ 17.116.010and 17.116.050, however, the Court goes outside the record in this case, citing §§ 17.04.020 and 17.04.030 for the proposition that the general purpose of Title 17 of the Hamilton City Code is “to promote the general welfare.”[1] Opinion, ¶¶ 23, 26. The Court goes so far as to criticize the Neighbors for focusing on the mandatory language of § 17.116.050. Opinion, ¶ 25. Yet, nothing in our caselaw-and the Court cites no Montana authority to support its approach-requires us to look at the general purpose of a collection of statutes to the exclusion of the specific purpose of the particular statute(s) at issue. In Massee v. Thompson, 2004 MT 121, 321 Mont. 210, 90 P.3d 394, for instance, the statutes at issue were §§ 46-6-311, -602, and -603, MCA. Rather than analyzing the purpose of Title 46 (which governs criminal procedure), we analyzed the purpose of these three particular statutes. See Massee, ¶¶ 34-39, 43. Likewise, in Eklund v. Trost, 2006 MT 333, 335 Mont. 112, 151 P.3d 870, we analyzed the purpose of the particular statute at issue, namely, § 61-8-107, MCA. See Eklund, ¶¶ 35-39. We did not resort to the general purpose of Title 61 (which governs motor vehicles).
¶63 In the case at hand, by contrast, the Court ignores the express purpose of §§ 17.116.010 and 17.116.050, resorting instead to the general purpose of Title 17. Yet, while a statutory scheme may serve a general purpose of promoting the general welfare, this does not mean that particular statutes contained within that scheme are not intended *229 to protect a specific class of persons from a particular type of harm. The Court’s contrary approach is pure sophistry. Under the Court’s reasoning, the public duty doctrine should have applied in both Massee and Eklund, since Titles 46 and 61, MCA, could reasonably be characterized as “promoting the general welfare.” Indeed, the rather sweeping purpose of “promoting the general welfare” could apply to just about every title in the Code. Moreover, there is no reason to believe that laws which protect specific classes of persons from particular types of harm do not ultimately promote the general welfare.
¶64 Again, there is no authority supporting the Court’s fixation on the general purpose of Title 17 to the exclusion of the specific purpose of §§ 17.116.010 and 17.116.050. The Court states that “[w]e interpret an ordinance by looking first to its plain language.” Opinion, ¶ 22. Yet, the Court completely ignores the plain language of §§ 17.116.010 and 17.116.050, preferring instead to focus on select language in §§ 17.04.020 and 17.04.030. The Court states that “[w]e interpret an ordinance to give effect to its purpose and to avoid absurd results.” Opinion, ¶ 22. Yet, the Court completely ignores the express purpose of §§ 17.116.010 and 17.116.050, which is to protect occupants in the vicinity of a proposed precise plan of design from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties. Moreover, in so doing, the Court reaches the absurd result that these two ordinances do not protect anyone. See Nelson v. Driscoll, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21 (“[A] duty owed to all is a duty owed to none.” (internal quotation marks omitted)).
¶65 The Court also states that “[w]e will not determine legislative intent based upon the wording of any particular section or sentence, however, but only from a consideration of the statute as a whole.” Opinion, ¶ 22 (emphasis added). Yet, again, the Court does not consider §§ 17.116.010 and 17.116.050 as a whole, or even at all. Rather, the Court purports to consider Title 17 as a whole and then selects two particular ordinances-§§ 17.04.020 and 17.04.030-as controlling over all the others.
¶66 Moreover, the Court ignores the well-established rule of construction that specific provisions prevail over general provisions. See Oster v. Valley County, 2006 MT 180, ¶ 17, 333 Mont. 76, ¶ 17,140 P.3d 1079, ¶ 17 (“[M]ore specific statutes prevail over general provisions of law.”); Taylor v. Dept. of Fish, Wildlife & Parks, 205 Mont. 85, 91, 666 P.2d 1228, 1231 (1983) (“We recognize the rule of *230 statutory construction which provides that special statutes will prevail over general statutes.”); see also § 1-2-102, MCA (“[A] particular intent ... controls] a general one that is inconsistent with it.”). Here, § 17.116.010 states that the intent of the precise plan of design is “to provide for orderly development of property to insure compatibility to the surrounding existing ... uses” (emphasis added). The specific language of § 17.116.050, states that a proposed precise plan of design “shall” be rejected, modified, or conditioned if such plan “would substantially depreciate property values in the vicinity or would unreasonably interfere with the use or enjoyment of property in the vicinity by the occupants thereof for lawful purposes” (emphases added). The word “shall” is defined as “mandatory.” Hamilton City Ordinance § 17.04.040(B)(3). The import of these provisions-to protect occupants in the vicinity of a proposed precise plan of design from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties-prevails over any general intent to promote the general welfare. Oster, ¶ 17; Taylor, 205 Mont. at 91, 666 P.2d at 1231.
¶67 Furthermore, it is not necessarily true that the specific intent of protecting occupants in the vicinity of a proposed precise plan of design is inconsistent with the general intent of promoting the general welfare. The Court opines that these two goals cannot exist in harmony, i.e., that a benefit to individual landowners would be “to the detriment of the general welfare.” Opinion, ¶ 30. The Court conjectures that “potentially adverse consequences” to the City, such as “innumerable lawsuits,” would result under the Neighbors’ interpretation of the ordinances. Opinion, ¶ 27. However, there is nothing in the record to support the parade of horribles feared by the Court. Nor has the Court cited any legal authority for the proposition that the general welfare must suffer whenever a municipality owes a duty to protect occupants in the vicinity of a proposed plan of development from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties. Indeed, it is equally-if not more-plausible that such a duty would benefit the general welfare, not be to its detriment.
¶68 In sum, the Court substitutes what it would have intended when enacting §§ 17.116.010 and 17.116.050 in place of the actual intent expressed by these ordinances. As support for its view, the Court erroneously elevates the broadly-stated, general purpose of “promoting the general welfare” over §§ 17.116.010 and 17.116.050’s specific purpose of protecting occupants in the vicinity of a proposed precise *231 plan of design from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties. In so doing, the Court effectively renders the first special-relationship exception to the public duty doctrine (see Nelson, ¶ 22) a nullity.
¶69 For the reasons set forth above and in Justice Leaphart’s dissent, I conclude that the special relationship exception to the public duty doctrine applies here and that the City owed the Neighbors a duty of care-though this will be small consolation to the Neighbors, who have been condemned by the City and its officials to endure the apparently unregulated hellish conditions created by Kennedy’s Tavern & Casino.[2]
II
¶70 Wholly aside from the special relationship exception, the public duty doctrine does not apply here for a second reason. The Court asserts that the Neighbors “admit the validity of the public duty doctrine.” Opinion, ¶ 12. This is patently untrue. Nowhere in their briefs do the Neighbors “admit” the validity of the public duty doctrine.
¶71 Asa matter of fact, in the course of this litigation, the Neighbors challenged the doctrine’s constitutionality. At the hearing on the City’s motion for summary judgment, the Neighbors argued as follows:
Now, with respect to this well-repeated doctrine of the Public Duty Doctrine, in the State of Montana we have a constitutional provision which says that cities will be liable for suit for injury to person or property, except as may be specifically provided by law by a two-thirds vote of each house of the legislature. In other words, the liability of public entities, the state, county, cities and towns, and others, are governed by statute. Now, we have those statutes. The statutes are set forth in Title 7, which covers specifically local government, and it treats the subject of immunity in section MCA Section 7-1-4125, which merely repeats the constitutional provision in the record. In wording it says, “As *232 provided in Article II, Section 18, of the Montana Constitution, a municipality has no immunity from suit for injury to a person or property, except as may be specifically provided by law by a two-thirds vote of each house of the legislature.”
There have been enacted by law certain limitations on liability. Specifically, in Section 2-9-102, it set a-said, “Every governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function except” again, as provided by statute.
Now, the City argues that the common law doctrine of Public Duty Doctrine applies. If it were to apply, it must be enacted by statute. There is no statute, and I beg of them to show me a statute which says that the common law doctrine of Public Duty Doctrine shall apply to municipalities in the State of Montana. No such statute exists. And that doctrine is a common law doctrine. It cannot apply. MCA 1-1-108 says, “In this state there is no common law in any case where the law is declared by statute.”
As to liability of municipalities in this state, it is declared by statute. And specifically, the whole Title 7 sets forth the responsibilities and liabilities of municipalities. We therefore believe that this Court must rule, as a matter of law, that the Public Duty Doctrine does not apply to municipalities in the State of Montana.
¶72 The Neighbors’ argument has merit, and it calls into doubt the premise underlying the whole of the Court’s analysis, namely, that the public duty doctrine survived the enactment of Article II, Section 18 of the 1972 Montana Constitution. That provision states: “The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature.” Mont. Const, art. II, § 18. Thus, governmental immunity from tort exists in this State only as provided by statutes enacted pursuant to a two-thirds vote of both houses. See Whiting v. State, 248 Mont. 207, 221-22, 810 P.2d 1177, 1186 (1991). Moreover, any common law doctrine of governmental tort immunity is no longer available. Mont. Const, art. II, § 18; § 1-1-108, MCA (“In this state there is no common law in any case where the law is declared by statute.”).
*233 ¶73 As to the public duty doctrine vis-á-vis governmental immunity from tort, the District Court observed in its Opinion & Order as follows:
“The public duty rule is not technically grounded in government immunity, though it achieves much the same results. Unlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was [any] enforceable duty to the plaintiff in the first place.” [Quoting Eugene McQuillin, The Law of Municipal Corporations vol. 18, § 53.04.25, at 197-98 (3d ed., West 2003).]
Indeed, at bottom, both governmental tort immunity and the public duty doctrine preclude a plaintiff from obtaining just compensation for injuries perpetrated by a negligent governmental actor. Yet, the public duty doctrine has not been codified in this State by a two-thirds vote of both houses of the Legislature. Rather, the doctrine is a nineteenth-century holdover from the common law-a judicially-created shield insulating governmental entities from liability for negligence and misfeasance. See generally Massee, ¶¶ 79-85 (Nelson, J., specially concurring and dissenting). Thus, by effectively providing governmental immunity from tort in the absence of an explicit legislative grant of such immunity, the doctrine serves as an end-around the fundamental right of individuals to sue local governmental entities for injury to person or property-a right that is supposed to be subject to only one exception: laws enacted by a two-thirds vote of both houses of the Legislature.
¶74 The delegates to the 1972 Constitutional Convention unequivocally rej ected governmental tort immunity. As reported by the Bill of Rights Committee, the notion of barring tort suits against the State for negligent acts by its officials and employees is “repugnant to the fundamental premise of the [sic] American justice: all parties should receive fair and just redress whether the injuring party is a private citizen or a governmental agency.” Montana Constitutional Convention, Comments on the Bill of Rights Committee Proposal, February 22, 1972, p. 637. During the deliberations on the proposed language of Article II, Section 18, Delegate Wade J. Dahood, Chairman of the Bill of Rights Committee, explained:
We have an opportunity now, as long as in Montana no one else will accept it, to make sure that we have full redress and full justice for all of our citizens. So that way, we reduce public dissatisfaction with the administration of justice and make sure *234 that every citizen of Montana has the full right to which he’s entitled. We submit it’s an inalienable right to have remedy when someone injures you through negligence and through a wrongdoing, regardless of whether he has the status of a governmental servant or not.
Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, p. 1764.
¶75 The public duty doctrine frustrates the will of the people as expressed in Article II, Section 18, and this Court errs in perpetuating the doctrine’s existence 36 years after the adoption of the Constitution. It is long past time that we consign this antiquated doctrine to the dustbin of history, where it belongs.
Ill
¶76 Lastly, the Neighbors’ allegations and arguments raise the question of whether the City’s acts and omissions with respect to the Neighbors’ properties amount to inverse condemnation-a claim that the City cannot avoid by invoking the public duty doctrine.[3]
¶77 The Fifth Amendment to the United States Constitution states that “private property [shall not] be taken for public use, without just compensation.” This guarantee “was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” Armstrong v. United States, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). Thus, for example, it is well-settled that the application of a general zoning law to particular property effects a taking if the law denies the owner all productive or economically beneficial use of the property or excessively interferes with the owner’s distinct investment-backed expectations. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003,112 S. Ct. 2886 (1992); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 98 S. Ct. 2646 (1978). No precise formula determines when property has been taken (in the constitutional sense); the question necessarily requires a weighing of the private and public interests at issue. See *235 Agins v. City of Tiburon, 447 U.S. 255, 260-61, 100 S. Ct. 2138, 2141 (1980), overruled in part on other grounds, Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 540-45, 125 S. Ct. 2074, 2082-85 (2005).
¶78 In addition, Article II, Section 29 of the Montana Constitution states, in pertinent part: “Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner.” By its plain language, this provision affords Montanans a protection that is independent of the Fifth Amendment. If the City, by its acts or omissions, has “taken or damaged” the Neighbors’ private property as contemplated by Article II, Section 29, then as a matter of fundamental constitutional right, the City must pay just compensation to the full extent of the Neighbors’ loss.
¶79 “Takings cases do not always arise out of situations where the government has formally condemned property. Instead, some regulatory or other activities may effect a taking, necessitating that owners bring inverse condemnation proceedings against the government.” Julius L. Sackman, Nichols on Eminent Domain vol. 2A, § 6.03[1], at 6-182 (3d ed., Matthew Bender 2006). “Inverse condemnation” is “a generic description applicable to all actions in which a property owner, in the absence of a formal condemnation proceeding, seeks to recover from a governmental entity for the appropriation of his property interest.” Nichols on Eminent Domain § 6.03[2], at 6-182.1; see also United States v. Clarke, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130 (1980) (“The phrase ‘inverse condemnation’ appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.”). “Such a suit is ‘inverse’ because it is brought by the affected owner, not by the condemnor. The owner’s right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation.” Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 5 n. 6, 104 S. Ct. 2187, 2191 n. 6 (1984) (citation and some internal quotation marks omitted).
¶80 State and federal courts favor inverse condemnation as a way for property owners to protect their interests, and state courts recognize a host of actions that constitute valid inverse condemnation actions. See Nichols on Eminent Domain § 6.03[2], at 6-184 to 6-186; see also Eugene McQuillin, The Law of Municipal Corporations vol. 11A, § 32.132.40, at 290-98 (3d ed., West 2000), at 20-22 (Supp. 2007) (discussing a variety of grounds for inverse condemnation actions). *236 Knight v. City of Billings, 197 Mont. 165,642 P.2d 141 (1982) (“Knight-Billings”) and Knight v. City of Missoula, 252 Mont. 232, 827 P.2d 1270 (1992) (“Knight-Missoula”) provide pertinent illustrations.
¶81 InKnight-Billings, the plaintiffs were individual homeowners who owned residences on the west side of 24th Street West in Billings, Montana. They had purchased their properties in the years between 1954 and 1976. In 1975, a large shopping center (Rimrock Mall) was opened on 24th Street West south of the plaintiffs’ properties. By the time of the litigation, there were also two large discount stores, a supermarket, a hardware store, a mini-mall, two convenience stores, and several office buildings along 24th Street West, and another supermarket was under construction near the plaintiffs’ properties. In addition, the street provided access to an interstate highway from the city proper. See Knight-Billings, 197 Mont. at 166-67,642 P.2d at 141-42.
¶82 Until 1972, 24th Street West was a two lane roadway with on-street parking. In 1972, the City of Billings widened 24th Street West to provide four lanes of traffic. In 1976, the city further widened 24th Street West by condemning real property exclusively on the east side of the street. No real property was taken from the west side of the street, where the plaintiffs had their properties. In 1978, the street was widened by the addition of a fifth lane situated in the middle of the other four lanes, to provide for left-hand turns from 24th Street West. Traffic counts on 24th Street West indicated an average daily vehicular traffic flow of 6,330 vehicles in April 1966; 9,684 vehicles in August 1970; 17,040 vehicles in July 1975; and 18,018 vehicles in 1979. See Knight-Billings, 197 Mont. at 167-68, 642 P.2d at 142.
¶83 Meanwhile, in 1972, the City of Billings adopted a zoning ordinance, pursuant to which the plaintiffs’ properties were zoned as single-family dwellings. In 1978, the plaintiffs petitioned the Billings City Council for a zoning change that would permit their properties to be reclassified as residential professional; however, the proposed zoning change was denied, and in consequence, the plaintiffs’ properties remained zoned for residential purposes only. Also in 1978, the city created a lighting maintenance district to provide lighting for 24th Street West. The lights used were of a higher intensity than normally found on a residential street. Although several of the plaintiffs protested the proposal for the lighting district, their protest was denied. See Knight-Billings, 197 Mont. at 167-68, 642 P.2d at 142-43.
*237 ¶84 After the failure of their petition for a zoning change, the plaintiffs filed an action against the City of Billings charging inverse condemnation of their properties. The evidence at trial revealed the following changes to 24th Street West and the plaintiffs’ properties:
Formerly [24th Street West] was relatively quiet, and had but two traffic lanes. The front yards of the residences were suitable for family or social gatherings. Residents or their guests could park their cars on the street. There was no difficulty getting in and out of driveways. Sidewalks were safe from passing traffic. Noise and pollutant levels were low and not distracting or harmful. There was no undue refuse. Family pets were safe. There was no noticeable vibration from passing traffic and the area was quiet at night.
After the 1976-78 condemnation project on 24th Street West was completed, conditions changed. There is now no free access into driveways, but instead long waits in the fifth lane for passing traffic. Free access to and from the driveways is nearly impossible. There have been traffic accidents in front of the residential properties, and sometimes upon their properties. Children and pets are not safe in the front yards and pedestrian traffic along the sidewalks a few feet from passing vehicular traffic is dangerous. Average traffic flows at 22 miles per hour past their houses. Rocks and rubbish from passing traffic are thrown upon their lawns and into their houses. The sidewalks are constantly filthy, especially in winter. The noise from the passing traffic is so loud that front doors must be closed for conversation to be heard inside. Traffic noise is loud and aggravating at night. The houses cannot be ventilated from the east side because of dust and exhaust fumes. The houses and contents are constantly subject to vibrations. One of the residents testified that she had to tape her windows to avoid the bright light from the high intensity sodium vapor lighting that was installed.
Knight-Billings, 197 Mont. at 168-69, 642 P.2d at 143.
¶85 The district court found that by reason of the changed conditions on 24th Street West, the plaintiffs’ properties were “ ‘no longer desirable for residential use’ ” and could not “ “be put to the highest and best use without a change in zoning restrictions and regulations.’ ” However, the court also found that “the conditions on 24th Street West were not caused by the City but by persons using business establishments situated on 24th Street West” and that “the actions of *238 the City of Billings were within the proper exercise of the City’s police power.” See Knight-Billings, 197 Mont. at 170, 642 P.2d at 143.
¶86 On appeal, we addressed the city s contention that its actions were merely in response to the burgeoning development of commercial and other enterprises along 24th Street West, i.e., that the city had not created the business growth but merely adapted to it. We held that recovery for inverse condemnation is not precluded just because the governmental authority is validly exercising its police powers. To the contrary, recovery may be allowed under theories of easement or nuisance imposed on the plaintiffs’ properties. See Knight-Billings, 197 Mont. at 170-71, 642 P.2d at 144.
¶87 We also rejected the notion that an actual physical invasion of the plaintiffs’ properties by the city had to occur. We concluded that the result of the city’s actions had been “to impose a servitude, a limitation upon the use and marketability of plaintiffs’ properties as residential.” We noted that what remained “is that plaintiffs’ properties, through the actions of the City, have become unsuitable for residential use, and the plaintiffs’ right to use their properties [for residential purposes] is limited to a degree of constitutional magnitude.” See Knight-Billings, 197 Mont. at 172-73, 174-75, 642 P.2d at 144-45, 146.
¶88 Finally, we observed that in the 1976-78 widening of 24th Street West, the city had compensated the homeowners on the east side of the street but not the homeowners on the west side of the street. Thus, the plaintiffs had been “consciously singled out or selected to bear a burden which [the city] also consciously elected not to impose on others, even others otherwise similarly situated.” Knight-Billings, 197 Mont. at 173-74, 642 P.2d at 145 (citation and internal quotation marks omitted). We held that on these facts, the city had “interfered with the private property interests of the plaintiff so as to constitute a‘taking’by inverse condemnation.” Knight-Billings, 197 Mont. at 174, 642 P.2d at 145-46.
¶89 In Knight-Missoula, the plaintiffs alleged that their property had been damaged by noise, dust, fumes, runoff, and increased traffic from a nearby dirt road and the City of Missoula’s refusal to close or maintain the road. Knight-Missoula, 252 Mont. at 240, 827 P.2d at 1275. We reversed the trial court’s grant of summary judgment in favor of the city, ruling that the plaintiffs’ inverse condemnation claim was viable. Knight-Missoula, 252 Mont. at 243, 827 P.2d at 1277. We held that the plaintiffs had raised genuine issues of material fact regarding diminution in the value of their property by reason of the existence and use of the road and the City of Missoula’s refusal to close *239 or maintain it.[4] Knight-Missoula, 252 Mont. at 240, 243, 827 P.2d at 1275, 1277.
¶90 Other courts have likewise recognized that inverse condemnation occurs when a continuing nuisance ripens into a constitutional taking. See e.g. City of Jacksonville v. Schumann, 167 So.2d 95, 102 (Fla.App. 1964); see also Carlos A. Ball, The Curious Intersection of Nuisance and Takings Law, 86 B.U. L. Rev. 819 (2006) (exploring the issue of when a nuisance ripens into a constitutional taking and arguing, for purposes of nuisance/takings cases, in favor of the “peculiar and substantial” standard articulated in Richards v. Washington Terminal Co., 233 U.S. 546, 557, 34 S. Ct. 654, 658 (1914)).
¶91 Here, the Neighbors alleged in their complaint that the manner in which Kennedy’s Tavern & Casino is operated constitutes a continuing nuisance. The Neighbors also alleged that despite numerous complaints, 911 calls, and requests for relief to City officials, and despite attending and voicing complaints at many City Council meetings, the City and its various officials failed and refused to take appropriate action to abate the nuisances caused by the manner in which the Casino is operated. Plaintiff Prosser contended that as a result, the value of her property has been diminished. (Plaintiffs White and Crotty rent their property.)
¶92 Likewise, in her answers to the City’s First Interrogatories, Prosser stated that the value of her property has been depreciated due to the City’s ongoing failure and refusal to enforce the condition, placed on Kennedy’s Precise Plan of Design (“PPD”), that the Casino “shall comply with all federal, state and local laws.” She provides, under oath, specific examples to this effect, and she requests $80,000 in damages “for loss of sale and inability to sell my home.”
¶93 In the Neighbors’ brief in opposition to the City’s motion for summary judgment, Prosser argued diminution in value of her property by reason of the City’s failure and refusal to enforce the PPD condition and abate the nuisances created by the Casino. Again on *240 appeal, the Neighbors assert that Prosser suffered depreciation of property value. They argue as follows:
Because of the noise and interference with the use and enjoyment of her property due to the nuisances caused by the Casino by being in such close proximity to her property, Occupant Prosser placed her property on the market and tried to sell it but was unable to find a buyer. She and the realtor involved attributed the failure to sell or find a buyer to the existence of the Casino immediately next to her home. [Citations to her affidavit and her answers to the City’s interrogatories.]
By approval of the operation of the Casino by these Defendants in a primarily residential area without assuring compatibility with the surrounding uses which are primarily as residential single family residences, the City promoted and facilitated the Casino’s ability to create private and public nuisances in the vicinity by noise and other activities of the Casino and its patrons in such close proximity to Occupants’ residences late at night and over an extended period of time causing depreciation of property values in the vicinity and causing unreasonable interference with the use and enjoyment of the property of Occupants.
¶94 The City has never denied that such depreciation could occur. Indeed, recognition of this eventuality is set forth plainly in the language of § 17.116.050, which states: “If the proposed precise plan of design would substantially depreciate property values in the vicinity..., such plan shall be rejected or shall be so modified or conditioned before adoption as to remove the objections” (emphasis added). Notwithstanding, as argued by the Neighbors, the City has promoted and facilitated the creation and continuation of a nuisance by Kennedy’s Tavern & Casino, which in turn has resulted in depreciation of property values in the vicinity, Prosser’s abutting property in particular.
¶95 As noted above, private property may only be taken or damaged for “public use.” U.S. Const. amend. V; Mont. Const. art. II, § 29. In Kelo v. City of New London, 545 U.S. 469, 125 S. Ct. 2655 (2005), the Supreme Court reaffirmed a broad definition of“public use” under the Fifth Amendment-specifically, “public purpose,” as opposed to “use by the public.” See Kelo, 545 U.S. at 478-83, 125 S. Ct. at 2662-64. The Supreme Court held that the City of New London’s economic development plan met this broad definition, since the plan (which coordinated a variety of commercial, residential, and recreational uses of land) was designed to promote economic development and provide *241 appreciable benefits to the community, including new jobs and increased tax revenue. See Kelo, 545 U.S. at 483-84,125 S. Ct. at 2664-65. See also Julius L. Sackman, Nichols on Eminent Domain vol. 2A, § 7.02[2], at 7-28, § 7.02[3], at 7-32, § 7.02[7], at 7-40 (3d ed., Matthew Bender 2006) (noting that the broad meaning of “public use”-e.g., revitalizing the local economy by creating temporary and permanent jobs, or generating a significant increase in tax revenue-has prevailed over the narrow conception of “public use”-i.e., actual use of the acquired property by the public).
¶96 Likewise, in Rutherford v. City of Great Falls, 107 Mont. 512, 86 P.2d 656 (1939), this Court considered whether the legislation at issue served a “public purpose,” quoting with approval the following definition:
“A public purpose * * * has for its objective the promotion of the general welfare of all the inhabitants or residents within a given political division, as, for example, a state, the sovereignty and sovereign powers of which are exercised to promote the public health, safety, morals, general welfare, security, prosperity, contentment, and equality before the law of all the citizens of the state.”
Rutherford, 107 Mont. at 517, 86 P.2d at 658 (asterisks in original) (quoting Green v. Frazier, 176 N.W. 11, 17 (N.D. 1920)). In addition, we observed in City of Missoula v. Mountain Water Co., 228 Mont. 404, 743 P.2d 590 (1987), that § 70-30-102, MCA, provides a “broad interpretation” of “public use.” See Mountain Water, 228 Mont. at 412, 743 P.2d at 595. Indeed, § 70-30-102, MCA, enumerates a wide range of public uses. See generally § 70-30-102(1)-(45), MCA.[5]
¶97 I make no attempt here to determine whether the depreciation of property values in the vicinity of Kennedy’s Tavern & Casino, which the Neighbors allege has been promoted and facilitated by the City, serves a public purpose. I am satisfied that the Neighbors’ allegations in this regard and the evidence presented thus far are sufficient to survive summary judgment. The Neighbors have established that genuine issues of material fact remain as to whether the City has taken or damaged Prosser’s property for public use-perhaps “to promote the general welfare,” as the Court endlessly asserts, or to promote economic development, as Kelo authorizes-by failing and *242 refusing to take appropriate action to abate the nuisances caused by the manner in which the Casino is operated. To the extent that the City has taken or damaged Prosser’s property, she is entitled to just compensation to the full extent of her loss under Article II, Section 29 of the Montana Constitution.
¶98 The Court launches into its own “entirely gratuitous analysis” of these issues in ¶¶ 15-17 of the Opinion. In ¶¶ 16-17, the Court addresses whether Plaintiffs White and Crotty, given that they rent their property, are entitled to compensation under an inverse condemnation theory. It does not appear from the record, however, that White and Crotty are seeking recovery for a taking or damaging. In ¶ 15, the Court apparently reaches the merits of Prosser’s inverse condemnation claim, asserting that she cannot recover damages because she purchased her property “after the government action,” which the Court assumes was the approval of Kennedy’s PPD in April 2000. However, Prosser has alleged that the depreciation in the value of her property is the result of a series of events-including, the City’s failure and refusal to enforce the condition, placed on the PPD, that the Casino “shall comply with all federal, state and local laws” and the City’s corresponding promotion and facilitation of the ongoingnuisance created by the Casino. Cf. Blasdel v. Montana Power Co., 196 Mont. 417, 425, 640 P.2d 889, 894 (1982) (“ ‘Property is taken in the constitutional sense when inroads are made upon an owner’s use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time.’ ” (quoting United States v. Dickinson, 331 U.S. 745, 748, 67 S. Ct. 1382, 1385 (1947))); Hart v. City of Detroit, 331 N.W.2d 438, 445 (Mich. 1982) (“It is common for [an inverse condemnation action] to involve a continuous wrong by the condemnor rather than a single act.”). The record is replete with allegations that the City’s acts and omissions have occurred during the course of Prosser’s ownership of her property. Moreover, there exists a factual issue as to whether Prosser’s property value has depreciated during her period of ownership as a result of the City’s conduct. I submit that it is inappropriate for this Court to decide, as a matter of law, that any and all depreciation in Prosser’s property value occurred prior to the governmental actions at issue.[6] *243 ¶99 Lastly, the Court misstates my position. I do not contend that the City’s approval of Kennedy’s PPD “caused” the Neighbors’ property to depreciate in value. Opinion, ¶ 14. Rather, I simply observe that Prosser has so alleged. Obviously, this is a factual matter properly resolved at trial. In my view, she should be permitted to litigate the merits of her inverse condemnation claim-including whether the City’s actions amount to a taking or damaging for public use, whether the City’s actions “caused” Prosser’s property to depreciate in value, and whether such depreciation occurred during her ownership of the property. The Court errs in denying her this opportunity.
IV
¶100 The Court errs in concluding that the special relationship exception to the public duty doctrine does not apply on the facts of this case, and I join Justice Leaphart’s Dissent as to this issue. Furthermore, the Court errs in perpetuating the public duty doctrine in the face of Article II, Section 18. Finally, the Neighbors have established that genuine issues of material fact remain as to whether the City has taken or damaged Prosser’s property for public use for which it owes her just compensation to the full extent of her loss, as required by Article II, Section 29.
¶101 I would reverse and remand this case for further proceedings on the Neighbors’ tort claims and Prosser’s inverse condemnation claim. I dissent from our failure to do so.

 Neither the Neighbors nor the City cites § 17.04.020 or § 17.04.030. Indeed, neither of these ordinances is part of the record before this Court. Rather, the Court obtained copies of these provisions from the City of Hamilton in the course of writing the Opinion in this case. I do not suggest that the Court had “some sort of sinister motive” in doing so. See Opinion, ¶ 24. I am simply pointing out that rather than interpret the actual ordinances that the parties have asked us to interpret, the Court instead has obtained copies of ordinances that the parties did not ask us to interpret and then interpreted those. The Court justifies these actions on the ground that “[pjarties rarely, if ever, provide the Court with a complete version of a title to the Montana Code Annotated when they seek to have the Court interpret a section of that title.” Opinion, ¶ 24. But that is precisely my point: The parties here sought to have this Court interpret two sections of Title 17; thus, there was no need for them to provide or for us to obtain a complete version of Title 17. The Court never explains why, under these circumstances, it was necessary to obtain a complete version of Title 17. Nor does the Court explain why, when the parties here sought to have this Corut interpret §§ 17.116.010 and 17.116.050, the Court instead decided to interpret §§ 17.04.020 and 17.04.030. As for the Court’s suggestion that it is appropriate to “obtainf] a complete version of the legislative enactment that the parties seek it to interpret when the parties have failed to provide a complete version,” Opinion, ¶ 24,1 do not dispute this point. But again, the parties here have provided “a complete version” of the legislative enactments that they seek us to interpret-namely, §§ 17.116.010 and 17.116.050. They have not asked us to interpret the entirety of Title 17; thus, there was no need for them to provide it or for the Court to obtain it.

 As alleged by the Neighbors, those conditions include the following: the Casino’s remaining open past 2:00 a.m.; excessively loud music late at night; excessive noise when dumping bottles and refuse in the early morning hours between 4:30 and 6:00 a.m.; creation of a possible fire hazard to the Neighbors’ homes by stacking cardboard boxes next to the wooden fence separating the Neighbors’ properties from the Casino property; patrons yelling and talking loudly and using vulgar and profane language in the Casino’s parking lot late at night; quarreling and fighting in the parking lot; use of drugs and consumption of alcoholic beverages and food outside the Casino; revving and excessive idling of vehicle engines in the parking lot; and patrons urinating in the Neighbors’ yards.

 The Court asserts that I am engaging in “back-seat lawyering” and attempting to “convert” the Neighbors’ tort claims against the City into an action for inverse condemnation. Opinion, ¶ 14. Even if I were so inclined to “convert” the Neighbors’ tort claims-wbich I am not-there would be no need to do so. As reflected in their pleadings and arguments in the District Court and on appeal, which I set out in ¶¶ 91-93 below, the Neighbors plainly have raised claims that the City’s acts and omissions with respect to the Neighbors’ properties amount to inverse condemnation. The Court tacitly concedes this point by proceeding to address the Neighbors’ standing to bring these claims in ¶¶ 15-17 of the Opinion.

 Notably, we also held that the plaintiffs’ nuisance claim survived summary judgment, given the City of Missoula’s perpetuation of a “continuing nuisance” by not closing, paving, or otherwise maintaining the road. See Knight-Missoula, 252 Mont. at 244-47,827 P.2d at 1277-79. In so doing, we observed that “ ‘a city is hable for damages with respect to maintaining a nuisance in the same manner as a private person,’ ” Knight-Missoula, 252 Mont. at 246, 827 P.2d at 1279 (quoting Walton v. City of Bozeman, 179 Mont. 351, 356, 588 P.2d 518, 522 (1978)), and that “[sovereign immunity] does not extend to a suit for the abatement of a nuisance,” Knight-Missoula, 252 Mont. at 246, 827 P.2d at 1279.

 Notably, the Legislature recently amended § 70-30-102(12), MCA, to prohibit the taking of private property for urban renewal “if the purpose of the project is to increase government tax revenue.” See Laws of Montana, 2007, ch. 512, § 2.

 For these reasons, the Court’s statements of the law in ¶ 15 are inapt. The Court asserts that “ ‘it is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser.’ ” Opinion, ¶ 15 (alteration omitted) (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463 (2001)). This abbreviated *243 quotation of Palazzolo, however, fails to reflect the fact that the Supreme Court was referring to a particular type of taking not at issue here. Specifically, the Supreme Court was referring to “a direct condemnation action, or when a State has physically invaded the property without filing suit,” i.e., situations in which “the fact and extent of the taking are known.” Palazzolo, 533 U.S. at 628, 121 S. Ct. at 2463. Such is not the case here, where the fact and extent of the alleged taking or damaging were not known until Kennedy failed to comply with the PPD condition and the City failed or refused to take effective action to enforce the condition. Notably, the Supreme Court went on to state in Palazzolo that “[a] challenge to the application of a land-use regulation, by contrast, does not mature until ripeness requirements have been satisfied.... It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner.” Palazzolo, 533 U.S. at 628, 121 S. Ct. at 2463.